OPINION OF THE COURT
John Cataldo, J.
The defendant is charged with 66 RCNY 1-35 (i), intimidation or disruption of Fulton Fish Market business[1] and Penal Law § 240.26 (1), harassment in the second degree. He moves *527 to dismiss the accusatory instrument upon the grounds that: (a) the offenses charged are unconstitutional as applied to his words, in violation of his free speech rights under both the United States and New York Constitutions; and (b) that the defendant is a victim of selective and discriminatory prosecution. (CPL 170.30 [1] [f].) Defendant further moves, pursuant to CPL 240.70, to preclude the People from introducing evidence at trial for failure to timely answer defendant’s discovery demand.
A. Freedom of Speech
The accusatory instrument alleges that the defendant, on three separate dates in front of 119 South Street in the County and State of New York, interfered with and disrupted the business of the Fulton Fish Market (hereinafter the Market) by threatening three replacement employees by stating to each, respectively, "[W]hen the cops leave, the blood is going to run off of your bald fucking head”; "Once the police leave, I’m going to get you”; and "[0]nce the police leave you’ll get yours.”
The defendant asserts that the application of the statutes herein to his words violates his freedom of speech under the First Amendment of the US Constitution and under article I, § 8 of the New York Constitution. Consequently, the court’s analysis is limited to the issue of whether the defendant’s specific words may be penalized.
It is defendant’s position that his speech, aimed at the three different complainants, did not constitute "fighting words”, did not create a clear and present danger of violence, and did not comprise any other form of proscribable speech. According to the defendant, his words were at most crude outbursts or insulting language which, in and of themselves, cannot be banned. (Chaplinsky v New Hampshire, 315 US 568 [1942]; Cohen v California, 403 US 15, 20 [1971]; People v Dietze, 75 NY2d 47 [1989].)
Under defendant’s version of the events, these words were spoken during a union protest in the course of a labor dispute. The complainants were all newly hired unloaders working at the Market after contracts with the protesters’ unloading companies had been terminated by the City of New York. Defendant admits to engaging in verbal protests, and to being one of the most vocal protesters during the demonstrations. While he concedes his alleged words could be considered offensive and inviting of dispute, he believes they did not rise to a level likely to cause a physical fight. Furthermore, he denies he was *528 ever in face-to-face confrontations with the complainants as is required under the "fighting words” doctrine. According to the defendant, numerous police officers and police barricades separated the defendant from the complainants.
In addition, defendant states the words he is alleged to have spoken at most alluded to future violent action, conditioned upon the police first leaving the area, and thus their advocacy was not directed to inciting other demonstrators to imminent lawless action nor was it likely to do so. Therefore, defendant states his words may not be punished under the theory that they created a "clear and present danger” of imminent lawless action. (Brandenburg v Ohio, 395 US 444 [1969].)
The People, in opposition, assert that defendant’s words threatened physical injury to the addressees during face-to-face confrontations between the defendant and each complainant, thereby meeting the required elements of the "fighting words” doctrine. Further, the People maintain that defendant’s arguments that these threats were not "fighting words”, and were not made in face-to-face encounters, but were instead mere crude outbursts made while the defendant and the complainants were separated by police barricades, is a factual dispute which is for resolution by the fact finder at trial, and not by way of a constitutional claim which may be resolved by pretrial motion. The People assert that the defendant’s words are sufficient for pleading purposes to support the charges in the accusatory instrument.
Despite the broad language of the First Amendment and the even more expansive language of the New York Constitution,[2] freedom of speech has never been interpreted "to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses.” (Cohen v California, supra, 403 US, at 19; People v Shack, 86 NY2d 529 [1995].) Thus, notwithstanding the language of the constitutional guarantees to freedom of speech, it has long been recognized that the State may penalize a speaker on the basis of the spoken word (e.g., statutes which penalize perjury, conspiracy, intimidation of witnesses, extortion, coercion, criminal solicitation, falsely reporting an incident).
*529 Three separate doctrines which permit the penalizing of speech are brought into play by this defendant’s words. The defendant has raised' two of these: "fighting words” and words which advocate imminent lawless action. A third category of proscribable speech which defendant has failed to address, but which is central to this prosecution, are those words which constitute "true threats.” (Watts v United States, 394 US 705 [1969].) Each of these doctrines will therefore be analyzed in relation to the defendant’s words as set forth in the accusatory instrument.
1. Fighting Words
In Chaplinsky v New Hampshire (315 US 568, 572 [1942], supra), the Supreme Court enumerated certain categories of speech, considered to be of such slight social value as a step toward truth and the exposition of ideas, that society’s interest in maintaining order and morality outweighed any benefit that might be derived from allowing those forms of speech to be exercised. Among the categories of proscribable speech listed in Chaplinsky were "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting words’ those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” (Supra, at 572.) By this language, the Court created what has since been known as the "fighting words” doctrine.
In order to constitute "fighting words”, the following elements must be established: (1) the speaker must address his words directly to a specific individual; (2) the encounter must be face-to-face; (3) the words must be likely to provoke the average addressee to violence under the circumstances; and (4) the threat of such violent response must be imminent. (Chaplinsky v New Hampshire, 315 US, at 573, supra.)
The element of the "average addressee” was designed to safeguard against the suppression of speech which might only provoke a particularly violent or sensitive listener. A test which turned upon the response of the actual addressee would run the risk of impinging upon the free speech rights of the speaker who could then be silenced based upon the particular sensitivities of each individual addressee. Such a test would have an obvious chilling effect on speech. Therefore, the Supreme Court has steadfastly required that the words punishable under the doctrine are only those that " 'men of common intelligence would understand would be words likely to cause an average addressee to fight.’ ” (Gooding v Wilson, 405 US *530 518, 523 [1972]; Chaplinsky v New Hampshire, supra, 315 US, at 573.) As the Court noted in Cohen v California (supra, 403 US, at 20), even insulting or offensive words may have expressive value and are not "fighting words” unless uttered as direct personal insults likely to provoke violent reaction in the ordinary citizen. Hence, a State may not punish merely offensive or abusive speech without a showing that the average person under the circumstances, if the target of such words, would be prone to an immediate violent response. (See, People v Dietze, 75 NY2d 47 [1989], supra.)
The continuing viability of the "fighting words” doctrine was recently reaffirmed by the Supreme Court in R. A. V. v St. Paul (505 US 377 [1992]). In R. A. V., the Court addressed the question of whether "fighting words” are in and of themselves without First Amendment protection or whether only the "non-speech” element attached to the words is outside the First Amendment.
R. A. V. (supra) involved a challenge to a Minnesota statute which sought to penalize bias-motivated hate crimes. The defendant was charged with violating the statute by burning a cross in the yard of an African-American family. The ordinance read (505 US, at 380): " 'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.’ ” The ordinance, as interpreted by the Minnesota Supreme Court, was limited to "fighting words”, " 'conduct which itself inflicts injury or tends to incite immediate violence.’ ” (Supra, at 380.)
Justice Scalia, writing for the majority in R. A. V. (supra), stated that despite the verbal character of "fighting words”, the thoughts or ideas expressed are not what is being regulated and are not themselves without First Amendment protection. He noted that in some circumstances "fighting words” may be "quite expressive indeed.” (Supra, at 385.) What the government actually proscribes under the "fighting words” doctrine is the mode of communication connected to the speech: the provocation to violence, which Justice Scalia refers to as a "nonspeech” element connected to the words themselves. (Supra, at 386.) Thus, in order for "fighting words” to be said to be without First Amendment protection, it must first be established that they were uttered under a prescribable mode of expression.
*531 The history of the "fighting words” doctrine and its culmination in R. A. V. (supra) clearly demonstrates that words cannot be classified as "fighting words” based upon a review of their content alone. The context of the utterance must first be examined to determine whether the words are truly "fighting words.” (See, e.g., People v Stephen, 153 Misc 2d 382, 387 [Crim Ct, NY County 1992].) This is especially critical where the words involved are only abusive or insulting language. Yet, even the most seemingly provocative language, sufficient on the face of a pleading, may ultimately be found not to have been "fighting words” under a full contextual analysis; for example, if found to have been uttered in a joking or lighthearted manner or with " 'a disarming smile’ ” (Chaplinsky v New Hampshire, supra, 315 US, at 573).
In determining the likely response of an average addressee under the circumstances of this particular case, a consideration of the ordinary citizen’s familiarity with the well-publicized history of unlawful activities within the Fulton Fish Market, including acts of violence, intimidation, property damage and alleged links to organized crime, is appropriate for the trial court to consider. In 1992, the City Council held public hearings which included testimony by loaders, unloaders and others associated with the Market who had been the victims of intimidation, violence and corrupt practices (see, e.g., New York Times, Fulton Panel Gets Details on Violence, May 5, 1992, at Bl). These ongoing problems at the Market were the impetus for the recent passage of chapter 1-A of title 22 of the Administrative Code (eff June 15, 1995) and the rules promulgated thereunder. This new legislation contains a detailed system of licensing provisions, including requirements for fingerprinting and background checks of all loaders and unloaders, formulated by the city government in the hope of bringing an end to corrupt practices at the Market. (See, Report of Comm on Economic Dev, regarding adoption of Local Laws, 1995, No. 50/1995 of City of New York; Mayoral Press Release No. 327-95, June 15, 1995.) It was in light of this background that Mayor Giuliani, just days before the incidents set forth in the accusatory instrument, terminated the unloading contracts with defendant’s companies and replaced them with the company which employed the complainants. It is within this context that the complainants are alleged to have been threatened by the defendant. The likelihood of an imminent violent response to the alleged words should be evaluated within the common knowledge of the average addressee under these surrounding circumstances.
*532 Furthermore, the fact that the defendant’s threats were conditioned on the police first leaving the area does not rule out the likelihood of imminent violent response. The threat of imminent violence required under the "fighting words” doctrine is not the violence of the defendant speaker but is the responsive violence of the average addressee. It is immaterial that the defendant’s words did not indicate his own immediate intention to attack the complainants because this does not negate the strong likelihood that an average addressee, feeling threatened and in danger, would immediately respond with violence against the speaker, "to beat him to the punch” so to speak.
Moreover, an alleged police presence of unknown size and location cannot, as a matter of law, be said to be an impenetrable barrier to violent response. The parties, in their submissions, have set forth two strongly divergent pictures of the circumstances surrounding the utterance of these words. Defendant claims the police separated him from the complainants. The People assert all three confrontations were face-to-face encounters, were not made while the defendant was behind a picket line, and were not made while police separated the parties.[3] These factual disputes cannot be determined by this court by pretrial motion, but may only be resolved at trial.
For pleading purposes, this defendant’s words, taken in the factual context as set forth in the accusatory instrument, are sufficient to support the prosecution of the defendant under the "fighting words” doctrine. These highly provocative words, direct threats to inflict physical injury on each of the three complainants, are alleged to have caused disruption at the Market. In this court’s view, few words could more readily be classified as "fighting words” than threats to physically injure the person to whom the words are directed. Here, defendant’s words, pledges to engage in a fight as soon as the police left the *533 area, are words likely to result in reflective violence against the speaker by the average addressee. Even if it could be argued that these hostile words, voiced during a labor dispute, were of some limited value to the exchange of ideas in the course of these demonstrations, an imminent and likely threat of responsive violence by the replacement workers would outweigh any speech value attached to such words and allow for their prosecution.
Accordingly, the defendant’s words may be penalized under the theory of prosecution that they constitute "fighting words.”
2. Incitement to Imminent Lawless Action ("Clear and Present Danger Test”)
Defendant next contends his words were not intended to incite other persons to violence against the complainants. The doctrine of incitement to "imminent lawless action” traces its origins to the clear and present danger test of Schenck v United States (249 US 47 [1919]). In Schenck, the Court acknowledged the power of the State to regulate words which create a clear and present danger to the government or its citizens. The Court stated that: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.” (Supra, at 52 [citations omitted].)
The scope of the "clear and present danger” doctrine was narrowed by the Court in Brandenburg v Ohio (395 US 444 [1969], supra). In Brandenburg, a Ku Klux Klan leader was convicted for advocating political reform through violence and for assembling with a group formed to teach such criminal syndicalism. In videotapes taken at the Klan rally, members stated the group’s intention to march on Congress. The Court held that the advocacy of violence is protected by the First Amendment so long as the advocacy does not incite people to imminent action.
Brandenburg (supra) established the following elements which constitute the modern clear and present danger test: (1) the content of the speech advocates the use of force or violation of law; (2) the speaker intends to incite or produce a violation of law; (3) there exists a likelihood that lawless response will occur; and (4) such a lawless response is imminent. The doctrine acknowledges that the words spoken may have expressive value, however, the interests in preserving the peace outweigh the value of the speech and allow it to be penalized.
*534 Defendant contends his words do not constitute such advocacy or incitement to violence. Correspondingly, the People have not alleged that the defendant was attempting to incite other third parties to imminent lawless action against the complainants. Instead, the People’s theory of the case is that the defendant directly threatened the complainants in face-to-face encounters. This is evidenced by review of the accusatory instrument which contains no allegations that other third parties were present when the defendant uttered these words to the complainants. Thus, while the content of the defendant’s words are of a kind which could have incited third parties to violence against the complainants, the facts as alleged in the accusatory instrument and in the People’s submissions, do not support the prosecution of the defendant under this theory.
3. True Threats
True threats are words which are voluntarily and intentionally uttered which avow a present or future determination to inflict physical injury on an individual or individuals. True threats, as a proscription on pure speech, must be carefully distinguished from words which constitute constitutionally protected speech.
The seminal case on true threats is Watts v United States (394 US 705 [1969], supra). In Watts, an 18 year old attending a rally in Washington, D.C. told a group of other attendees that he had just received his draft notice but he had no intention of going for his physical examination. He said: "If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.” "They are not going to make me kill my black brothers.” (Supra, at 706.) The Supreme Court found that in order for words to be a true threat they must convey a serious or genuine threat, and must be distinguished from idle, careless talk, exaggeration, jests, or political hyperbole. (Supra, at 708; see also, United States v Malik, 16 F3d 45, 51 [2d Cir], cert denied 513 US 968; People v Dietze, supra, 75 NY2d, at 53-54.) To make this determination, the Court in Watts looked to the context under which the words had been uttered, the conditional nature of the statement, and the reaction of the listeners who laughed at these remarks, and found the words spoken by Watts were mere political hyperbole, protected by the First Amendment.
The true threat doctrine, in contrast to the "fighting words” doctrine, focuses the brunt of its analysis on the actual content *535 of the words spoken. There is no requirement that there be any imminent threat of a breach of the peace, either by violent acts of the defendant speaker, third parties, or by the person to whom the words are directed. Moreover, unlike "fighting words”, true threats of physical injury continue to be viewed as outside the First Amendment because they are said to have no value to the exchange of ideas. (See, R. A. V. v St. Paul, supra, 505 US, at 388; United States v Carrier, 672 F2d 300, 306 [2d Cir], cert denied 457 US 1139 [1982].) Thus, once it is determined that the speaker’s words are true threats, the words themselves have no First Amendment protection.
The prohibition of true threats is grounded in the State’s legitimate interests in protecting its citizens from the fear of violence, the disruption it engenders, and from the possibility that such threats of violence will be carried out (R. A. V. v St. Paul, supra, 505 US, at 388). There is, however, no requirement that the subject of the threat be shown to have been placed in actual fear of physical injury or that the person threatened was even aware that the threat had been made, so long as the threat was uttered or otherwise communicated to another person. (Watts v United States, 394 US 705 [1969], supra; United States v Carrier, supra, 672 F2d, at 304; United States v Kelner, 534 F2d 1020, 1023 [2d Cir], cert denied 429 US 1022 [1976].) Genuine or true threats need not be made in face-to-face encounters; they may be communicated through third parties, by telephone, letter or by numerous other means. (See, e.g., People v Cabot, NYLJ, Mar. 19, 1996, at 25, col 1 [App Term, 1st Dept]; People v Smith, 89 Misc 2d 789 [App Term, 2d Dept], cert denied 434 US 920 [1977]; People v McKay, 140 Misc 2d 696 [Nassau Dist Ct 1988].) Of course, evidence that the recipient of the threat was the person to whom it was directed, that the recipient or others took measures to protect against the threat, or that steps were taken toward carrying out the threat, may all be considered in the full contextual analysis of the fact finder, in reaching its determination as to whether the words were actual true threats.
In order to constitute a "true threat” the speaker must utter the words with the intent of conveying a threat of physical injury. An intent to carry out the threat is not a necessary element. The State need only demonstrate an intent to place the addressee in fear that the threat was a serious one. In People v Shack (86 NY2d 529, 539 [1995], supra), the Court of Appeals noted that by including words in the harassment statute that defendant act "with intent to harass, annoy, threaten or alarm *536 another person”, the Legislature created a specific intent element requiring a defendant to be aware of his own criminal conduct. (Shack involved the aggravated harassment statute of Penal Law § 240.30 [2].) The Court noted that this specific intent element removes the possibility that criminal liability would be imposed based upon the unascertainable sensitivities of the victim. (Supra; see also, People v Bakolas, 59 NY2d 51, 53-54 [1983]; cf., Rogers v United States, 422 US 35, 47 [1975] [concurring opn of Marshall, J.].) Parenthetically, where a threat statute fails to contain a specific intent element, the majority of Federal circuit courts have held that the appropriate standard is to evaluate the defendant’s state of mind by using a general intent test. (See, e.g, United States v Darby, 37 F3d 1059, 1063-1064, 1066 [4th Cir 1994], cert denied 514 US 1097, 115 S Ct 1826 [1995].) Those cases use the objective criterion of whether a " 'reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm.’ ” (United States v Johnson, 14 F3d 766, 768 [2d Cir], cert denied 512 US 1240 [1994] [quoting Roy v United States, 416 F2d 874, 877-878 (9th Cir 1969)].)
Finally, the court rejects defendant’s contention that these words may not be prosecuted due to their alleged "conditional” nature. To constitute a true threat it need only be shown that it is possible to carry out a threat, whether in the present or the future. A "condition” created by the defendant, as herein where the defendant allegedly stated he would not attack the complainants until the police left, does not impede a prosecution. These kinds of prerequisites must be distinguished from words which make a threat so equivocal or impossible to fulfill that it could not reasonably be taken as a serious threat.
In United States v Malik (supra, 16 F3d, at 49), the Second Circuit found the defendant’s threats to injure the complainants as soon as the defendant was released from prison were sufficient to constitute true threats. Though the threats could not be carried out immediately due to the defendant’s incarceration, they were demonstrated to be of a sufficiently impending nature to satisfy the element of an intent to convey a serious threat.
In United States v Kelner (supra, 534 F2d, at 1023), the court found the defendant’s threats to kill Yasser Arafat were proven to be serious threats. In Kelner, the defendant, a Jewish Defense League (JDL) member, stated to a news reporter that *537 (at 1021): "We have people who have been trained and who are out now and who intend to make sure that Arafat and his lieutenants do not leave this country alive * * * We are planning to assassinate Mr. Arafat * * * Everything is planned in detail * * * It’s going to come off.” The defendant claimed his words were mere political hyperbole. However, the Second Circuit held the utterance of the words to be sufficient to establish a true threat. (Supra, at 1025.) In Watts (supra), the defendant’s threat against President Johnson was premised on purely hypothetical events which the defendant’s words made clear could not actually occur. Thus, the threat in Watts, taken in context, was mere political hyperbole. In Kelner, on the other hand, the threat was not "conditional” in the sense of the word as used by the Court in Watts (supra, 394 US, at 708). This is because Kelner’s threat was a serious one which could have been carried out upon Mr. Arafat’s impending arrival in the country to speak to the United Nations. While the use of the word "conditional” in the true threat cases is sometimes misleading and imprecise, it is clear that the occurrence of an upcoming event before the threat can be fulfilled will not, by itself, prevent its prosecution. It is only when the words convey a threat so remote, preposterous or humanly impossible that they should be said, on their face, to be outside the potential realm of prosecution as true threats.
Here, defendant Prisinzano’s alleged threats that: "when the cops leave, the blood is going to run off of your bald fucking head”, "once the police leave, I’m going to get you” and "once the police leave you’ll get yours” are sufficient for pleading purposes to support a prosecution for true threats to physically injure the complainants. Such words, on their face, demonstrate a serious threat to inflict physical injury on the complainants as soon as the police left the area. Under the circumstances as they appear in the accusatory instrument, these words, voluntarily and intentionally uttered, support a prosecution under the true threats doctrine.
Whether these words will ultimately be proven to be serious threats as opposed to mere crude outbursts will be resolved at trial when the full context under which these words were uttered can be explored. The court notes that similar threats "to get” an individual have in some circumstances been found to constitute criminal threats beyond a reasonable doubt after full examination of the circumstances under which they were made, while in other cases the surrounding circumstances showed the words to be mere crude outbursts. (See, e.g., State v *538 Saltzman, 235 Neb 964, 967-968, 458 NW2d 239, 242 [1990] [defendant’s telephone call in which he stated "he was going to get (complainant’s) wife and kids” constituted a true threat to commit a crime of violence]; Burrell v State, 541 SW2d 615, 616 [Tex Crim App 1976] [complainant’s testimony that, inter alia, "the Burrell brothers (defendants) said they would get me, period” constituted a proscribable threat].)
In People v Todaro (26 NY2d 325, 330 [1970]), a teenage defendant’s words "I’ll get you for this”, made to the arresting officer after the defendant had already been placed under arrest on another charge and was seated in a patrol car on the way to the police station, were held to be too equivocal to support the defendant’s conviction for the further charge of harassment. The Court found that based upon a review of the full circumstances under which the words were spoken, this single statemént, unsupported by any other words or acts, had not been demonstrated to be anything more than apparent bravado. A different conclusion was reached in Commonwealth v Ashford (268 Pa Super 225, 407 A2d 1328 [1979]). In Ashford, although the defendant, like the defendant in Todaro, made threatening remarks to the arresting officers on the way to a police station, the surrounding circumstances developed at trial proved that the defendant’s words were not mere bravado but were genuine threats intended to terrorize the officers. In Ashford, the defendant, after having been placed under arrest on a disorderly conduct warrant, repeatedly threatened to kill the arresting officers and their families while he was being transported to the police station and throughout booking procedures.
Defendant claims that People v Dietze (75 NY2d 47, supra) supports his contention that his words were mere crude outbursts. However, the words relating to the true threat charge in Dietze were only determined to be a crude outburst after a full contextual analysis at trial. The defendant in Dietze was charged with harassment for threatening the complainant with physical injury or physical contact pursuant to Penal Law § 240.25 (former [l]).[4] The harassment charge was grounded in Dietze’s statement that he would "beat the crap *539 out of [the complainant] some day or night on the street.” (Supra, at 50.) The Court found that the trial record failed to show that these words were a serious threat nor should they have been taken seriously as they had not been shown by other words or acts to have been anything more than a crude outburst. Therefore, the defendant’s conviction in Dietze under Penal Law § 240.25 (former [1]) was reversed based upon a full review of the circumstances under which the words were uttered. The Court in Dietze, however, clearly recognized the validity of a prosecution for words which constitute genuine threats as within the scope of this statute. Dietze, like Todaro (supra), demonstrates that resolution of whether words which are sufficient for pleading purposes are ultimately punishable speech is determined by a full contextual analysis by the fact finder at trial. (Cf., People v Dinan, 118 Misc 2d 857, 859 [Long Beach City Ct 1983] [threat by defendant that he was "going to get you f— Jews” (at 857) sufficient for pleading purposes; meaning of these words was a question of fact for the jury to consider in light of the entire incident]; see also, R. A. V. v St. Paul, 505 US 377, supra; Watts v United States, 394 US 705, supra; United States v Malik, 16 F3d 45, 49, supra; United States v Crews, 781 F2d 826 [10th Cir 1986]; United States v Carrier, 672 F2d 300, 306, supra; People v Dorns, 88 Misc 2d 1064 [Just Ct, Westchester County 1976], affd 96 Misc 2d 54 [App Term, 2d Dept 1978].)
Once, as herein, a defendant’s words have been demonstrated to meet the elements of a proscribable classification of speech, an accusatory instrument based upon those utterances should not be dismissed, as a full examination of the circumstances surrounding the utterance is a question best left to the jury. (United States v Ferrugia, 604 F Supp 668, 674 [ED NY], affd 779 F2d 36 [2d Cir 1985]; United States v Carrier, supra, 672 F2d, at 304, 306; People v Baldi, NYLJ, Feb. 6, 1996, at 30, col 1 [Nassau Dist Ct]; People v Vassallo, NYLJ, May 8, 1990, at 27, col 1 [Crim Ct, NY County].)
Accordingly, defendant’s claim that the statutes are unconstitutional as applied to his alleged words is without merit. The defendant has made no challenge to the constitutionality of the laws under which he stands charged. Rather, his sole *540 contention is that, under the context in which his words were uttered, they are within the protection of the First Amendment and article I, § 8 of the New York Constitution. The court finds that the allegations in the accusatory instrument are sufficient to support the defendant’s prosecution under both the "fighting words” and "true threat” doctrines. Therefore, defendant’s motion to dismiss for violation of his free speech rights is denied.
B. Selective Prosecution
Defendant moves to dismiss the accusatory instrument upon the ground that he is the victim of a selective and discriminatory prosecution. Defendant maintains that the law was not equally applied to other persons "similarly situated” to him in that replacement workers who defendant states engaged in conduct similar to his own were not arrested. He contends he was arrested, rather than the replacement workers, based upon his membership in an "arbitrary class of individuals” which he states to be "ousted Market employees.” (Defendant’s mem of law point II.)
The doctrine of selective enforcement is grounded in the right to equal protection under the law as guaranteed by the 14th Amendment and article I, § 11 of the New York Constitution. In Matter of 303 W. 42nd St. Corp. v Klein (46 NY2d 686, 693 [1979]), the Court set forth the two-prong selective prosecution test, which requires that a moving defendant demonstrate: (1) that the law was not applied to others similarly situated; and (2) that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification.
In order for a defendant to be entitled to a hearing on such a claim, his motion papers must set forth a strong showing of selective enforcement of the law, invidiously motivated. (Matter of 303 W. 42nd St. Corp. v Klein, supra.) To meet this strong showing, the defendant must supply factual details by sworn affidavit and other proof which demonstrate that he is more likely than not to succeed on the merits. (Supra, at 695-696.) Furthermore, the defense must overcome the presumption that the enforcement of laws is undertaken in good faith and without discrimination. (Supra, at 694; United States v Armstrong, 517 US —, —, 116 S Ct 1480, 1486 [1996].) Therefore, the defendant’s burden to prove a claim of discriminatory enforcement is said to be a heavy one requiring a showing of a consciously practiced pattern of discrimination. (People v Goodman, 31 NY2d 262, 269 [1972].)
*541 Here, in support of his motion, the defendant states that "the protesters hurled insults at the replacement workers and they responded in kind” (attorney’s affirmation in support of defendant’s motion to dismiss 9), "replacement employees verbally responded to the demonstrators’ protests” (defendant’s mem of law point II), and that one of the replacement workers brandished a knife and threatened a demonstrator (affirmation in support 12; defendant’s mem of law point II). Defendant states that no replacement workers were arrested.
These allegations fail to satisfy either of the two prongs of the selective prosecution test. In the first instance, defendant’s motion papers are based solely on the above-quoted allegations contained in his attorney’s affirmation and memorandum of law. They are founded solely upon conclusory hearsay from unstated sources and contain no factual details. There are no names of any of the alleged parties to these other alleged verbal exchanges nor any names of persons who might have witnessed or heard these incidents. No dates or times of these incidents are supplied, nor are any of the actual words alleged to have been spoken by any replacement workers set forth. In only one instance is a threat, rather than mere insults, alleged to have been made: that one replacement employee brandished a knife and threatened protesters. Again, even as to this alleged incident no words or factual details are supplied, only unsupported hearsay from unstated sources. Even if defendant could demonstrate sufficient factual details as to a single instance of a crime by a replacement worker who was not prosecuted, which he has failed to do, one instance would not be sufficient to demonstrate a pattern of selective prosecution. Thus, defendant has failed to set forth sufficient factual allegations to meet his heavy burden of showing selective prosecution.
Additionally, defendant has failed to set forth the necessary allegations to show that he was selected for prosecution because of his membership in an impermissible arbitrary classification. He alleges it was because he was an ousted Market employee, as opposed to a replacement worker, that he was arrested. However, the defendant admits in his motion papers that other protesters, and not just replacement workers, were hurling insults. There is no evidence that any of these other protesters were arrested. Only the defendant, who repeatedly threatened replacement workers with physical injury, is alleged to have been arrested. This contradicts his claim that the police were targeting protesters in favor of replacement work *542 ers. Moreover, defendant has failed to demonstrate that a distinction between protesters and replacement workers would constitute an impermissible arbitrary classification. (See, People v Barnwell, 143 Misc 2d 922 [Crim Ct, NY County 1989]; People v Nemadi, 140 Misc 2d 712, 725 [Crim Ct, NY County 1988].)
Accordingly, defendant’s motion papers do not rise to the level required to obtain a hearing. Defendant’s motion to dismiss the accusatory instrument for selective and discriminatory enforcement is denied.
C. Discovery
Defendant moves, pursuant to CPL 240.70 for sanctions for an alleged late response to his discovery demands. Defendant’s discovery demands were served by mail on February 1, 1996. The court file contains the People’s response to the defendant’s discovery requests, including a voluntary disclosure form, dated March 10, 1996. Defendant’s motion for preclusion or other sanctions is denied. The requested information has now been furnished to the defendant and defendant has shown no prejudice by the short delay in its production. Accordingly, the court finds no grounds for the imposition of any sanction. (CPL 240.70 [1]; 240.80 [3]; People v Kelly, 62 NY2d 516, 521 [1984]; People v Cunningham, 189 AD2d 821, 822 [2d Dept], lv denied 81 NY2d 1071 [1993].)
Conclusion
Defendant’s motions to dismiss the accusatory instrument for both: (1) violation of his constitutional rights to free speech; and (2) for selective and discriminatory prosecution are denied in all respects.

. The counts charging 66 RCNY 1-35 (i) are read in conjunction with the penalty provision at 66 RCNY 1-36 (b) (2), promulgated pursuant to Administrative Code of the City of New York § 22-215 (b) (ii) and § 22-223.

. The First Amendment of the US Constitution provides in relevant part that: "Congress shall make no law * * * abridging the freedom of speech.” New York Constitution, article I, § 8 provides in relevant part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. The mere presence of third parties separating the speaker and the addressee in the "fighting words” context would not automatically render the confrontation outside the definition of a face-to-face encounter without knowing the actual distance between the parties. There is no exact distance at which an encounter goes from a face-to-face encounter to outside its boundaries. However, the courts which have examined the face-to-face requirement have interpreted it as calling for extremely close physical proximity. (See, e.g., Hershfield v Commonwealth, 14 Va App 381, 384-385, 417 SE2d 876, 878, text and n 2 [1992] [distance of 55 to 60 feet while separated by fence is not face-to-face]; Garvey v State, 537 SW2d 709, 711 [Tenn Crim App 1975] [words spoken by defendant in his car to police officer walking down the street not face-to-face].)

. The defendant in Dietze (supra) was charged with Penal Law § 240.25 (former [1], [2]). Dietze held that Penal Law § 240.25 (former [2]), punishing abusive or obscene language, was unconstitutional on its face. Penal Law § 240.25 (former [1]) was the subject of the prosecution for threats. The charge of Penal Law § 240.25 (former [1]), which now appears at Penal Law § 240.26 (1) (as renum by L 1992, ch 345, § 3), is the same offense *539 with which defendant Prisinzano stands charged herein. Penal Law § 240.26 (1) reads: "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person * * * [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same.”