ROBINSON, J., dissenting.
The defendant, Laurence V. Parnoff, said the following to Kyle Lavin, a water company employee servicing a fire hydrant located on the defendant's property: "If you go into my shed I'm going to go into my house, get my gun and [fucking]
*665 kill you."[1] Lavin's colleague, David Lathlean, testified similarly, stating that he recalled the defendant telling him and Lavin that "if [they] didn't get off his property he was going to get a gun or something like that ... [t]o shoot [them]." I respectfully disagree with the majority's opinion, which allows the defendant to use the first amendment to the United States constitution to shield himself from what should be the obvious consequences of this unwarranted threat to two water company employees just doing their jobs. Even under the enhanced contextual focus of our recent decision in State v. Baccala , 326 Conn. 232, 163 A.3d 1, cert. denied, --- U.S. ----, 138 S.Ct. 510, 199 L.Ed.2d 408 (2017), the defendant's statement that he intended to shoot the water company employees is categorically different from even the most profane or offensive language contemplated in cases like Baccala and, therefore, constituted "fighting words" unprotected by the first amendment. Because these fighting words rendered sufficient the evidence supporting the defendant's conviction of disorderly conduct in violation of **428 General Statutes § 53a-182 (a) (1),[2] which is based on a defendant's "fighting or ... violent, tumultuous or threatening behavior," I would reverse the judgment of the Appellate Court, which reversed the trial court's judgment of conviction. See State v. Parnoff , 160 Conn. App. 270, 281, 125 A.3d 573 (2015). Accordingly, I respectfully dissent.
I begin by noting my agreement with the facts and procedural history set forth by the majority. I also agree with the standard of review stated by the majority pursuant to State v. Baccala , supra, 326 Conn. at 250-51, 163 A.3d 1, and State v. Krijger , 313 Conn. 434, 446-47, 97 A.3d 946 (2014), requiring independent appellate review of whether the defendant's statements, as established by the facts found by the jury, were subject to first amendment protection. I repeat these points herein only as necessary to explain my resolution of the defendant's claims.
"Fundamentally, we are called upon to determine whether the defendant's speech is protected under the first amendment to the United States constitution or, rather, constitutes criminal conduct that a civilized and orderly society may punish through incarceration. The distinction has profound consequences in our constitutional republic. If there is a bedrock principle underlying the [f]irst [a]mendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (Internal quotation marks omitted.) State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1.
"Only certain types of narrowly defined speech are not afforded the full protections of the first amendment, **429 including 'fighting words,' i.e., those words that 'have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.' ... Chaplinsky v. New Hampshire , 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)." State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1. In determining whether the words spoken by *666 the defendant were fighting words, this court considers whether they were "likely to provoke a violent response under the circumstances in which they were uttered ...."[3] Id.
In this context based analysis, this court considers "the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation." Id., at 240, 163 A.3d 1. Specifically, **430 this court considers "a host of factors" to determine whether the words spoken "were likely to incite a violent reaction." Id. First, "the manner and circumstances in which the words were spoken bears on whether they were likely to incite a violent reaction," as "[e]ven the court in [ Chaplinsky v. New Hampshire , supra, 315 U.S. at 573, 62 S.Ct. 766 ] acknowledged that words which are otherwise profane, obscene, or threatening might not be deemed fighting words if said with a disarming smile." (Internal quotation marks omitted.) State v. Baccala , supra, 326 Conn. at 240, 163 A.3d 1. Second, the "situation under which the words are uttered also impacts the likelihood of a violent response," including "whether the words were preceded by a hostile exchange or accompanied by aggressive behavior ...." Id., at 241, 163 A.3d 1.
In Baccala , we also determined that a "proper examination of context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made.... Courts have, for example, considered the age, gender, race, and status of the speaker.... Indeed, common sense would seem to suggest that social conventions, as well as special legal protections, could temper the likelihood of a violent response when the words are uttered by someone less capable of protecting themselves, such as a child, a frail elderly person, or a seriously disabled person." (Citations omitted.) Id., at 241-42, 163 A.3d 1.
"[W]hen there are objectively apparent characteristics that would bear on the likelihood *667 of such a response, many courts have considered the average person with those characteristics. Thus, courts also have taken into account the addressee's age, gender, and race." Id., at 243, 163 A.3d 1. "[S]everal courts have considered as part of the contextual inquiry whether the addressee's position would reasonably be expected to cause him **431 or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances." Id., at 245, 163 A.3d 1 ; see also id., at 243-44, 163 A.3d 1 (discussing higher standard of restraint for police officers). Baccala emphasized that cases requiring inquiry into the position of the addressee "affirm[s] the fundamental principle that there are no per se fighting words; rather, courts must determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond with violence. This principle is consistent with the contextual approach taken when considering other categories of speech deemed to fall outside the scope of first amendment protection, such as true threats and incitement." Id., at 245-46, 163 A.3d 1.
"Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." Id., at 250, 163 A.3d 1.
In Baccala , we applied this framework to conclude that there was insufficient evidence to sustain the conviction of a forty year-old physically impaired woman for breach of the peace in the second degree, determining that she had not uttered fighting words when she called a supermarket manager a "fat ugly bitch" and a "cunt," and said, "fuck you, you're not a manager ...." (Internal quotation marks omitted.) Id., at 251, 163 A.3d 1. In concluding that these "reprehensible" and "extremely offensive" words were not "akin to dropping a match into a pool of gasoline"; (internal quotation marks omitted) id., at 251-52, 163 A.3d 1 ; we emphasized that the altercation had started with a telephone call a few minutes earlier, **432 rendering the store manager "reasonably ... aware of the possibility that a similar barrage of insults, however unwarranted, would be directed at her," particularly given her "position of authority at the supermarket, [which] placed her in a role in which she had to approach the defendant." Id. We also noted that the store manager "was charged with handling customer service matters" and that "[s]tore managers are routinely confronted by disappointed, frustrated customers who express themselves in angry terms, although not always as crude as those used by the defendant. People in authoritative positions of management and control are expected to diffuse hostile situations, if not for the sake of the store's relationship with that particular customer, then for the sake of other customers milling about the store. Indeed, as the manager in charge of a large supermarket, [she] would be expected to model appropriate, responsive behavior, aimed at de-escalating the situation, for her subordinates ...." Id., at 252-53, 163 A.3d 1. Finally, we observed that the "store manager ... would have had a degree of control over the premises where the confrontation took place. An average store manager would know as she approached the defendant that, if the defendant became abusive, the manager could demand that the defendant leave the premises, threaten to have her *668 arrested for trespassing if she failed to comply, and make good on that threat if the defendant still refused to leave. With such lawful self-help tools at her disposal and the expectations attendant to her position, it does not appear reasonably likely that [the manager] was at risk of losing control over the confrontation." Id., at 253, 163 A.3d 1 ; see also id. ("a different conclusion might be warranted if the defendant directed the same words at [the manager] after [she] ended her work day and left the supermarket, depending on the circumstances presented"). Ultimately, we concluded that "the natural reaction of an average person in [the store manager's **433 ] position who is confronted with a customer's profane outburst, unaccompanied by any threats , would not be to strike her. We do not intend to suggest that words directed at a store manager will never constitute fighting words. Rather, we simply hold that under these circumstances the defendant's vulgar insults would not be likely to provoke violent retaliation. Because the defendant's speech does not fall within the narrow category of unprotected fighting words, her conviction of breach of the peace in the second degree on the basis of pure speech constitute[d] a violation of the first amendment to the United States constitution." (Emphasis added.) Id., at 256, 163 A.3d 1.
In my view, the majority's application of Baccala gives short shrift to the words actually used in concluding that they were not fighting words, notwithstanding its acknowledgment that a "reasonable person hearing [the defendant's statement] would likely recognize its threatening nature."[4]
*669 See **434 State v. Krijger , supra, 313 Conn. at 452, 97 A.3d 946 ("[t]he starting point for our analysis is an examination of the statements at issue"). The jury reasonably could have found that the defendant had threatened both water company employees with a gun if they did not leave his property. One of those employees, Lathlean, testified that the defendant had said that "if [they] didn't get off his property he was going to get a gun or something like that ... [t]o shoot [them]." The other employee, Lavin, testified that the defendant said that "[i]f you go into my shed I'm going to go into my house, get my gun and [fucking] kill you." See footnote 1 of this dissenting opinion. The majority further acknowledges that "it is reasonable to presume that an addressee in the position of the water company employees would understand the defendant's statement to be threatening, even though it was conditioned on further action or inaction by the water company employees," positing that, "under certain circumstances, such a statement could provoke a reasonable person to retaliate with physical violence to prevent the threat from **435 being carried out."[5] See State v. Pelella , 327 Conn. 1, 16-17, 170 A.3d 647 (2017) ; see also People v. Prisinzano , 170 Misc. 2d 525, 532, 648 N.Y.S.2d 267 (N.Y. Crim. 1996) ("the fact that the defendant's threats were conditioned on the police first leaving the area *670 does not rule out the likelihood of imminent violent response" with respect to fighting words). It is, however, at this point that the majority loses sight of the forest through Baccala 's trees.
First, the majority concludes that the defendant's statements were unlikely to provoke an immediate and **436 violent reaction because the objectively apparent circumstances did not indicate any immediate intent or ability on the part of the defendant to carry out the threat. The majority relies on the fact that the defendant appeared to be unarmed, insofar as he was clad only in shorts and carried only what appeared to be a can of worms, and was not heading in the direction of his residence-where he stated that his gun was located-at the time he made the statement. I disagree with this aspect of the majority's analysis. In my view, as soon as the defendant introduced the prospect of firearms into his exchange with the water company employees, he escalated the conflict over the apparent theft of hydrant water far beyond any possible epithets that he could have directed at Lavin and Lathlean. In contrast, the majority also suggests that Lavin and Lathlean were obligated to take the extremely angry defendant at his word-that any gun was stored in the house, well beyond his immediate reach. Indeed, Lavin understood the defendant to be concerned about his shed, which was located far closer to the location of the confrontation, insofar as Lathlean had entered the shed looking for the fire hydrant's cap. Moreover, in contrast to the store manager in Baccala , who exercised control over the situation in her store-a fact deemed significant by the majority in that case; see State v. Baccala , supra, 326 Conn. at 253, 163 A.3d 1 ; the water company employees lacked similar control insofar as the confrontation occurred on the defendant's secluded, wooded property.
I also disagree with the majority's reliance on the apparent lack of extreme reaction by Lathlean and Lavin to the threat, insofar as both-in the words of the majority-exercised a "heightened level of professional restraint" and neither reacted violently, nor even left the defendant's property in accordance with water company policy. The lack of reaction by the addressee is "probative," but not "dispositive" of whether the words **437 were fighting in nature. See, e.g., State v. Baccala , supra, 326 Conn. at 254, 163 A.3d 1. Although I agree with the majority that the employees' jobs servicing fire hydrants on land owned by others without prior notice to landowners "could precipitate encounters with confrontational property owners as part of their work," and that they would " 'reasonably be expected to ... exercise a higher degree of restraint,' " my agreement on that point ends with the water company employees being on the receiving end of vituperative language and epithets such as those in Baccala . Once the defendant explicitly introduced the specter of a shooting into the already tense situation-and there was no indication that he was joking or facetious-he escalated the confrontation beyond that subject to first amendment protection. Indeed, both Lathlean and Lavin testified that they notified the police because, in Lavin's words, the "situation was starting to get out of control," given the defendant's anger and his threat to get a gun.[6] *671 To this end, I find instructive the decision by the Georgia Court of Appeals in Evans v. State , 241 Ga. App. 32, 32-33, 525 S.E.2d 780 (1999), which rejected a sufficiency challenge to a disorderly conduct conviction on the basis of fighting words rooted in similar threats to shoot an amusement park security officer, who, like a water company employee or store manager, is expected to interact professionally with members of the public who may be behaving very badly. In Evans , while at Six Flags, a major amusement park, the defendant, **438 Evans, responded to the officer's "questions about ... [stolen] cotton candy by repeatedly saying, '[Fuck] that, that does not have [shit] to do with us,' " and most significantly, that " 'he was going to go to his vehicle, get his "pop," while pointing his hand at [the officer] like a pistol [and saying] "pop, pop, pop" .... That's when [Evans] started walking [toward] his vehicle.' [The officer] felt threatened, and he called for backup." Id., at 33, 525 S.E.2d 780. Citing Chaplinsky v. New Hampshire , supra, 315 U.S. at 568, 62 S.Ct. 766, the Georgia court held that " 'fighting words' can include specific threats to cause violence where they tend to provoke violent resentment." Evans v. State , supra, at 33, 525 S.E.2d 780. As in our decision in Baccala , the court emphasized that the "circumstances surrounding the incident are relevant to the determination," and stated that "Evans threatened that he was going to get a gun and shoot [the officer], and [the officer] felt threatened. But more importantly, Evans made a statement which under the circumstances was plainly designed to goad or incite the only officer present who was trying to handle a difficult situation involving several people. A rational juror could find that the statement was disrespectful of, directly challenged, and abused [the security officer's] authority. [The security officer] was a corporal with Six Flags Security and had been in the position for only one and one-half months. The fact that Evans did not get [the officer] to react is not determinative." Id., at 34, 525 S.E.2d 780 ; see Anderson v. State , 231 Ga. App. 807, 809, 499 S.E.2d 717 (1998) ("[T]he act of appellant in calling the sheriff a 'no-good son of a bitch' and admonishing that she should kick his 'ass' constituted fighting words. Further, the fact that the sheriff might be used to hearing this type of language is not a defense."), abrogated on other grounds by Golden Peanut Co. v. Bass , 249 Ga. App. 224, 547 S.E.2d 637 (2001), aff'd, 275 Ga. 145, 563 S.E.2d 116, cert. denied, 537 U.S. 886, 123 S.Ct. 32, 154 L.Ed.2d 146 (2002) ; **439 Person v. State , 206 Ga. App. 324, 325, 425 S.E.2d 371 (1992) (concluding that defendant used fighting words when he used profane, abusive language throughout encounter with police officer and screamed in officer's face, " 'I'm not going to any [goddamned] jail and I'm not wearing any mother-[fucking] handcuffs' " and threatened to " 'blow [the officer's] head off' "); cf. Matter of Welfare of M.A.H. , 572 N.W.2d 752, 759 (Minn. App. 1997) (statement did not constitute fighting words when juvenile "did not directly insult the police, or overtly threaten them by word or gesture").
In sum, as soon as the defendant explicitly told the two water company employees who were on or near an easement on his property in connection with their official duties, that he would get his gun and shoot them if they did not leave, his statements transcended those of an irritated property owner expressing himself with coarse language *672 to utility company workers who are expected to act professionally, even when the public they serve does not. Although we have stated that what constitutes a fighting word changes over time and that "public sensitivities have been dulled to some extent by the devolution of discourse"; State v. Baccala , supra, 326 Conn. at 254-55, 163 A.3d 1 ; I am not prepared to say that our discourse has devolved to the point that a person's threat to use a gun during a heated confrontation with public utility workers is anything less than a specific threat of violence likely to precipitate an immediate preemptive strike or, in its place, a significant law enforcement response. Cf. State v. Pallanck , 146 Conn. 527, 530, 152 A.2d 633 (1959) ("Even if the highway employees were, at the time, committing a trespass on the property of the defendant, as claimed by her, her employment of a dangerous weapon would not be warranted.... A mere trespass does not justify a landowner in using a dangerous weapon in an effort to eject the trespasser." [Citation omitted.] ); see also **440 General Statutes § 53a-20 (defense of premises). Put differently, for purposes of the fighting words doctrine as explained in Baccala , in which this court specifically emphasized that there was a lack of a threat of harm to the store manager; State v. Baccala , supra, at 256, 163 A.3d 1 ; the defendant's warning in the present case that he would resort to gun violence if Lathlean and Lavin did not leave his property was qualitatively different from even the most profane slur he could have directed at them.[7] Accordingly, I conclude that sufficient evidence supported the defendant's conviction of disorderly conduct.
Because I would reverse the judgment of the Appellate Court, which reversed the defendant's conviction of disorderly conduct, I respectfully dissent.

Had the state argued that the defendant's statement was not protected by the first amendment because it was a true threat, the trial court no doubt would have instructed "the jury on the definition of such a threat, as it would have been constitutionally required to do if the state had made such an argument." State v. Sabato , 321 Conn. 729, 734, 138 A.3d 895 (2016).

The state offers only People v. Prisinzano , 170 Misc. 2d 525, 648 N.Y.S.2d 267 (1996), in support of its argument. The court in Prisinzano concluded that "few words could more readily be classified as 'fighting words' than threats to physically injure the person to whom the words are directed," and that such threats might prompt an addressee to beat the speaker " 'to the punch.' " Id., at 532, 648 N.Y.S.2d 267. Although I recognize that this provides persuasive support for the state's theory, I am unpersuaded by that court's reasoning. In addition, the court reached its conclusion in the context of the peculiar circumstances of that case: a heated union protest on a city street, grounded in a dispute with a history of violence possibly connected to organized crime. Id., at 527-28, 531, 648 N.Y.S.2d 267. None of these factors exists in the present case. Additionally, at least one of the statements in Prisinzano could also be construed as personally insulting: " '[W]hen the cops leave, the blood is going to run off of your bald fucking head.' " Id., at 527, 648 N.Y.S.2d 267.
This court has suggested that a threat could fit within the fighting words exception, but has not based that conclusion on a theory of preemptive self-defense. See State v. Baccala , supra, 326 Conn. at 256, 163 A.3d 1 (suggesting that addition of threats might have made fighting words out of profane outbursts). For example, in State v. DeLoreto , 265 Conn. 145, 148, 168, 827 A.2d 671 (2003), this court concluded that statements made to a police officer, such as " 'Faggot, pig, I'll kick your ass,' " were true threats, rather than fighting words. The court observed, however, that "[t]hreatening statements that do not rise to the level of a true threat may nonetheless constitute fighting words ...." Id., at 168, 827 A.2d 671. However, in reaching that conclusion, the court was focused on the offensive nature of the threats, rather than the possibility they could cause preemptive self-defense. Id. (recognizing that words must reach higher level of offensiveness "to provoke a police officer to violence" than they would to provoke "ordinary citizen" to retaliation). I agree that some threats could be so insulting that they amount to fighting words in certain circumstances, but I do not believe that the statement in the present case rises to that level for the reasons outlined in part II of my concurring opinion.

I observe that the underlying incident occurred on the defendant's private land, and it is unclear to what extent, if any, the fighting words exception applies to statements made in private. See W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 965 (2000) (speculating on applicability of fighting words exception in home). The fighting words exception has typically been raised in, and arises in, situations that occur in public places. See, e.g., State v. Baccala , supra, 326 Conn. at 235, 163 A.3d 1 (summarizing underlying conduct that occurred in supermarket). This court has never had the opportunity to consider whether the fighting words exception applies to statements made in the privacy of one's home or land, and, after an extensive review, I am aware of no Connecticut cases in which the state obtained convictions for speech occurring in private places under a fighting words theory.
The closest this court has come to addressing the issue was in State v. Indrisano , 228 Conn. 795, 812, 640 A.2d 986 (1994), where this court interpreted the language of § 53a-182 (a) (1), and concluded that the statute is "consistent with the 'fighting words' limitation that must be applied when the conduct sought to be proscribed consists purely of speech." In other words, this court noted that its "holding was consistent with Chaplinsky , [and] ... recognized that § 53a-182 (a) (1) could constitutionally proscribe speech that, under a given set of circumstances, could fairly be characterized as fighting words that portend imminent physical violence." State v. Szymkiewicz , 237 Conn. 613, 619, 678 A.2d 473 (1996). This conclusion could be interpreted as a suggestion that fighting words can occur in private, because § 53a-182 (a) (1) does not require that the charged conduct occur in public, unlike the otherwise identically worded breach of the peace statute, General Statutes § 53a-181 (a) (1). Id., at 618, 678 A.2d 473. It is hardly determinative however, because this court did not hold that the fighting words exception can apply in private. In addition, Indrisano was not a fighting words case, as the court concluded that the defendant violated the disorderly conduct statute through his physical conduct. State v. Indrisano , supra, at 811-13, 640 A.2d 986.
Few courts have addressed the issue of whether the fighting words exception may be applicable to statements that occur in private, and those courts have reached different conclusions. Compare State v. Poe , 139 Idaho 885, 904, 88 P.3d 704 (2004) ("there is nothing in [United States Supreme Court precedent] that would indicate the [c]ourt believes that the use of 'fighting words' in or around one's own home should be constitutionally protected"), with B.E.S. v. State , 629 So.2d 761, 765 (Ala. Crim. App. 1993) (holding that, "[c]onsidering the circumstances under which these statements were made, including the fact that the statements were made during a private quarrel in the residence occupied by both the speaker and the addressee, we do not think the appellant's statements rise to the level of 'fighting words,' " and observing that similar comments in public settings had been "construed as fighting words" [emphasis omitted] ), cert. denied, Alabama Supreme Court, Docket No. 1921984 (December 3, 1993).
It is not obvious that the fighting words exception would apply to comments made in private for two reasons. First, if the private speech occurred in the home, the Supreme Court has held that some otherwise unprotected speech is subject to increased protection. See Stanley v. Georgia , 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (holding that obscenity exception to first amendment protection is insufficient to warrant invasion of "the privacy of one's own home"). Second, the history of the fighting words exception suggests an interest in public order. For example, in Chaplinsky , the Supreme Court looked favorably on the statute's limited application to public places in concluding that Chaplinsky's conviction did not violate his first amendment rights. Chaplinsky v. New Hampshire , supra, 315 U.S. at 573, 62 S.Ct. 766 (holding that statute at issue did not violate first amendment because it "is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace " [emphasis added] ). Admittedly, subsequent Supreme Court cases have not required that speech be made in a public setting to fit within the fighting words exception, but they have rejected the applicability of fighting words theories for other reasons. See, e.g., Cohen v. California , supra, 403 U.S. at 20, 91 S.Ct. 1780 (not imposing or considering public requirement with fighting words exception, but rejecting fighting words theory where statements could not have been construed as "direct personal insult").

I recognize that the water company had an easement over part of the defendant's land, which Lavin and Lathlean may or may not have exceeded, but any such property interest cannot be fairly equated to the control that a managing employee would have over property owned or leased by her employer.

It is this inherent difficulty in line drawing that has led to much of the scholarly criticism of the fighting words exception. See generally note, supra, 106 Harv. L. Rev. 1129 (arguing that fighting words exception provides less protection from offensive language to minorities and women, who may be less likely to respond to offensive language with violence).

Under such circumstances, it would be the offensiveness of the speech that would justify the application of the fighting words exception, rather than the possibility that its threatening nature might prompt preemptive self-defense.

The state initially charged the defendant with threatening in the second degree, but eliminated that charge in a subsequent, long form information. At oral argument before this court, the state explained that it considered a true threats theory difficult to establish in the present case.