ACCEPTED
03-14-00669-CR
3912915
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/27/2015 11:56:47 AM
JEFFREY D. KYLE
CLERK

No. 03-14-00669-CR

---

IN THE TEXAS COURT OF APPEALS
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/27/2015 11:56:47 AM
JEFFREY D. KYLE
Clerk

---

*EX PARTE*:
JUSTIN CARTER

---

Appeal from the 207th Judicial District,
Comal County, Texas

---

**BRIEF OF APPELLANT**
[Oral Argument Requested]

---

Chad P. Van Brunt
State Bar No. 24070784
Vivek Jampala
State Bar No. 24083242
310 S. St. Mary's Street
Suite 1840 – Tower Life Bldg.
San Antonio, Texas 78205
vanbruntlaw@live.com
(210) 399 – 8669
(210) 568 – 4927 (telecopier)

Donald H. Flanary, III.
State Bar No. 24045877
310 S. St. Mary's Street
29th Floor – Tower Life Bldg.
San Antonio, Texas 78205
(210) 226 – 1463
Attorneys for Justin Carter

## IDENTITY OF PARTIES AND COUNSEL

Presiding Judge:

The Honorable Jack Robison
District Judge of the 207th Judicial District
New Braunfels, Texas

Attorneys for Appellant at trial court:

Donald H. Flanary, III.
GOLDSTEIN, GOLDSTEIN, & HILLEY
310 S. St. Mary's St.
29th Floor – Tower Life Bldg.
San Antonio, Texas 78205
(210) 226 – 1463

Chad P. Van Brunt
LAW OFFICE OF CHAD VAN BRUNT
310 S. St. Mary's St.
Suite 1840 – Tower Life Bldg.
San Antonio, Texas 78205
(210) 399 – 8669

Attorneys for Appellee at trial:

Chari L. Kelly
Assistant District Attorney
COMAL COUNTY DISTRICT ATTORNEY'S OFFICE
150 N. Seguin, Suite 307
New Braunfels, Texas 78130
(830) 221-1300

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................ i

Index of Authorities ............................................................................... ii

Statement of the Case............................................................................ vi

Statement Regarding Oral Argument ................................................... vi

Issues Presented .................................................................................... vii

Statement of Facts.................................................................................. 1

Summary of Argument ........................................................................... 4

Argument:

I. The Trial Court Abused Its Discretion by not finding
Texas Penal Code §§ 22.07(a)(4) and (a)(5) Facially Unconstitutional........... 4

II. The Trial Court Abused Its Discretion by not Finding
Texas Penal Code §§ 22.07(a)(4) and (a)(5) Unconstitutional
as Applied to Justin Carter .................................................................... 14

Conclusion ............................................................................................. 30

Prayer ..................................................................................................... 32

Certificate of Service ............................................................................. 33

Certificate of Compliance ...................................................................... 33

# INDEX OF AUTHORITIES

**Cases**

*Abrams v. United States,* 250 U.S. 616 (1919)……………...……………..28

*ACLU v. Reno,* 929 F.Supp. 824 (E.D. Pa. 1996)……………..……………27

*Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004)………..…………5

*Ashcroft v. American Civil Liberties Union*, 535 U.S. 564 (2002)…………………6

*Baumgartner v. United States*, 322 U.S. 665 (1944)…………...……………31

*Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)………...….12

*Brandenburg v. Ohio,* 395 U.S. 444 (1969)………………………...……….passim

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)……………………………………12

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)…………………..…….passim

*Cohen v. California*, 403 U.S. 15 (1971)…………….…..……………...…passim

*Cook v. State*, 940 S.W. 2d 344, 347-348
(Tex.App.—[7th Dist.] 1997, pet. ref'd)…………………………….…………26

*Dennis v. United States,* 341 U.S. 494 (1950)...…………………………28, 29

*Ex parte Lewis,* 219 S.W.3d 335 (Tex. Crim. App. 2007)…………………………5

*Ex parte Nyabwa*, 366 S.W.3d 719
(Tex. App.—Houston [14th Dist.] 2011, pet. ref'd)……………………………5

*Ex parte Peterson*, 117 S.W.3d 804 (Tex. Crim. App. 2003)………………………5

*Ex Parte Weise*, 55 S.W.3d 617 (Tex. Crim. App. 2001)…………………..…….4

*Ex parte Wheeler*, 203 S.W.3d 317 (Tex. Crim. App. 2006)…………..…………5

*Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*,
159 S.W.3d 645 (Tex. Crim. App. 2005)……………………….……………4

*Hess v. Indiana,* 414 U.S. 105 (1973)…………………………..……25, 29

*Long v. Texas*, 931 S.W.2d 285 (Tex. Crim. App. 1996)……………………*passim*

*New York Times v. Sullivan*, 376 U.S. 254 (1964)……………………………6

*People v. Prisinzano*, 170 Misc.2d 525, 648 N.Y.S.2d 267 (1996)……………...20

*Roth v. United States*, 354 U.S.476 (1957)………………………....……...…7

*Roy v. United States,* 416 F.2d 874 (9th Cir. 1969)………………....………21, 22

*Schenck v. United States,* 249 U.S.48 (1919)…………………...…………27, 28

*Shaumburg v. Citizens for a Better Environment*,
444 U.S. 620 (1980)……………………………………………………..13

*State ex rel. Lykos v. Fine* 330 S.W. 3d 904 (2011)…………………………13

*State v. Rosseau*, 396 S.W.3d 550 (Tex. Crim. App. 2013)……….………………5

*Terminiello v. City of Chicago* 337 U.S. 1 (1949)……………….....……...18, 20

*The People v. B. F. Jones*, 62 Mich. 304 (1886)…………………………………5

*U.S. v. Morales*, 272 F.3d 284 (2001)………………..……………………21, 25

*United States v. Bagdasarian,* 652 F.3d 1113 (9th Cir. 2011)……………21, 22, 23

*United States v. O'Brien*, 391 U.S. 367 (1968)…………………………………8, 9

*United States v. Playboy Entm't Grp*., Inc., 529 U.S. 803 (2000)………………5, 6

*Virginia v. Black*, 538 U.S. 343 (2003)……………………………..…………*passim*

*Virginia v. Hicks*, 539 U.S. 113 (2003)……………………………12, 13, 19

*Walker v. State,* 327 S.W.3d 790
(Tex.App.—[2nd Dist.] 2010, no pet.)…………….……….…………………..15

*Watts v. United States*, 394 U.S. 705 (1969)……………….……………8, 21, 28

**Constitutional Statutory Authority**

U.S. Const. amend. I…………….....…………………..….…………...passim

U.S. Const. amend. V…………….…………………………………............4

U.S. Const. amend. XIV…………….……………………………………….4

Tex. Const. art. I, § 8…………….……………………………………….....4

Tex. Const. art. I, § 10…………….………………………………………….4

Tex. Const. art. I, § 12…………….……………………………….....…4

Tex. Const. art. I, § 19…………….………………………………….…4

Tex. Penal Code § 22.07…………….…………………………...……….passim

Tex. Penal. Code §1.07…………….……………………………………….10

18 U.S.C.A. § 875…………….……………………………………………….25

**Other Sources**

*The Next Challenge for the First Amendment: The Framework for an Internet Incitement Standard*, 51 Cath. U.L. Rev. 45 (2002)……………………………….27

*Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law* at 902. BYU Law Review (2002)…………….………………………………………….28

## STATEMENT OF THE CASE

Justin River Carter was charged by indictment on April 10, 2013 under sections 22.07(a)(4) and (a)(5) of the Texas Penal Code. The cause number is CR2013-159 Pending in the 207th Judicial District Court of Comal County, Texas. Mr. Carter sought relief from his continued prosecution by filing a pretrial writ of habeas corpus. A hearing was held on August 26 and 27 2014. On October 23, 2014 the trial court denied the application for writ of habeas corpus after due consideration. This appeal ensues.


## STATEMENT REGARDING ORAL ARGUMENT

This case addresses the validity of a Texas Statute in light of First Amendment Jurisprudence via a pre-trial writ of habeas corpus. Due to this implication, oral argument would assist this Honorable Court in its understanding of the case as well as provide an opportunity to address concerns that a written brief cannot fully accommodate standing alone.

# ISSUES PRESENTED

1. The Trial Court Abused Its Discretion by not finding Texas Penal Code §§ 22.07(a)(4) and (a)(5) Facially Unconstitutional.

2. The Trial Court Abused Its Discretion by not finding Texas Penal Code §§ 22.07(a)(4) and (a)(5) Unconstitutional as Applied to Justin Carter.

**STATEMENT OF FACTS**

On April 10, 2013, Justin Carter was charged in a single-count indictment with making a Terroristic Threat pursuant to Texas Penal Code § 22.07 under cause number CR2013-159 pending in 207th Judicial District Court of Comal County, Texas . The indictment, in pertinent part, reads as follows:

Paragraph 1

Justin River Carter…did then and there, with the intent to cause impairment or interruption of public communications, public transportation, public water, gas or public supply or other public service, threaten to commit any offense involving violence to any person or property, to-wit: by threatening to "shoot up a kindergarten, watch the blood rain down and eat the beating heart of one of them."

Paragraph 2

Justin River Carter…did then and there, with the intent to place the public or a substantial group of the public in fear of serious bodily injury, threaten to commit any offense involving violence to any person or property, to-wit: by threatening to "shoot up a kindergarten, watch the blood rain down and eat the beating heart out of one of them."

[CR Vol. 1 at 5].

The single count alleges two alternate theories of manner and means that can be used to find Mr. Carter guilty of committing a Terroristic Threat, if proven:

(1) cause impairment or interruption of public communications, public transportation, public water, gas, or power supply or other public service;

(2) place the public or a substantial group of the public in fear of serious bodily

1

injury.

These elements are codified under TEX. PENAL CODE §§ 22.07 (a)(4)—(a)(5) (West 2013) respectively.

Justin Carter (Carter from hereinafter) filed a pretrial writ of habeas corpus challenging his continued prosecution on the grounds that it violated his rights to free speech and due process under both the Texas and United States Constitutions as both a facial challenge to the statute and as applied to him. [CR Vol. 1 at 7-23]. A hearing was held beginning on August 26, 2014 wherein the issues concerning the writ of habeas corpus were addressed. [See RR Vol. 1-5]. In the hearing it was established that the alleged statement attributable to Carter was a screenshot of a post made on the social networking cite, Facebook. [RR Vol. 2 at 141, RR Vol. 5 Defendant's exhibit 9]. The screenshot is as follows:



Further evidence showed that the alleged screenshot came from an anonymous tip in Canada that was forwarded to law enforcement in Texas. [RR Vol. 5 State's Exhibit 5]. In addition to a facial challenge to § 22.07 of the Texas Penal Code, Carter argued that the statement attributable to him could only be considered as mere hyperbole or sarcasm. [CR Vol. 1 at 7-23]. Expert testimony was presented Dr. Sara Kimball that these statements were conditional and clear exaggerations that could not be taken as a true threat in any context. [RR Vol.2 53-79]. On October 23, 2014, the Trial Court declined relief to Carter after due consideration and this appeal ensues.

The continued prosecution of Justin Carter is an affront to the United States and Texas constitutional protections of free speech, due process and due course of law pursuant to the First, Fifth, and Fourteenth Amendments to the United States Constitution and Article 1, §§ 8, 10, 12, and 19 of the Texas Constitution. The State of Texas has violated his rights and held him under custody for a violation of a facially unconstitutional statute that criminalizes and chills protected speech. Furthermore the statements for which Carter is being prosecuted cannot constitute a "true threat" in any context and are not and never will be sufficient for submission to a jury for trial.

**ARGUMENT**

## I.    The Trial Court Abused Its Discretion by not finding Texas Penal Code §§ 22.07(a)(4) and (a)(5) Facially Unconstitutional.

A facial challenge to the constitutionality of a statute can be brought in a pretrial writ of habeas corpus. *Ex Parte Weise*, 55 S.W.3d 617, 620 (Tex. Crim. App. 2001). A habeas corpus claim of this type is a separate proceeding to the case set for trial and the Mr. Carter may appeal prior to the commencement of that trial. *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*, 159 S.W.3d 645, 650 (Tex. Crim. App. 2005). The trial court's decision to grant or deny an application for writ

4

of habeas corpus is reviewed under an abuse of discretion standard. *See Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). When the trial court's ruling determines the constitutionality of a statute, that ruling is reviewed *de novo*. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis,* 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). When a statute is attacked upon constitutional grounds, the reviewing court will ordinarily presume the validity of the statute. *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013). The burden rests upon the challenger to establish its unconstitutionality. *Id*.

However, that burden is reversed when the statute regulates speech based upon its content. *United States v. Playboy Entm't Grp*., Inc., 529 U.S. 803, 817 (2000); *Ex parte Nyabwa*, 366 S.W.3d 719, 723 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Regulation of speech based upon content is presumptively invalid, and thus the burden shifts to the government to rebut that presumption. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004); *Nyabwa*, 366 S.W.3d at 724.

> It is not the policy of the law to punish those unsuccessful threats which it is not presumed would terrify ordinary persons excessively; and there is so much opportunity for magnifying or misunderstanding undefined menaces that probably as much mischief would be caused by letting them be prosecuted as by refraining from it.

*The People v. B. F. Jones*, 62 Mich. 304 (1886).

5

While this quote may have no precedential value, it illustrates an age old concern in legal jurisprudence concerning the protections of the First Amendment. The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech or of the press." U.S. Const. Amend. I. At its core, the First Amendment prohibits the Government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). The United States Constitution provides an individual with a right to free speech and expression protected from arbitrary government interference and the government is thus prohibited from deciding the form or content of individual expression. *Cohen v. California*, 403 U.S. 15, 24 (1971); *see also United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 812 (2000) ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles."). The First Amendment, "'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly, but we have staked upon it our all.'" *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (citation omitted).

Of course, First Amendment protection is not absolute and the Supreme Court has defined three narrow categories of speech, "the prevention of which has never thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315

6

U.S. 568, 571-72 (1942). These exceptions are obscenities, *Roth v. United States*, 354 U.S.476, 483 (1957), incitement, *Brandenburg v. Ohio*, 395 U.S.444, 447-449 (1969), and fighting words, *Chaplinsky*, 351 U.S. at 572. Under this precedence, the Supreme Court of the United States has stated that only 'true threats' fall into these exceptions. *See Virginia v. Black*, 538 U.S. 343, 358-59 (2003).

This case arises out of a prosecution of Justin Carter for allegedly making a Terroristic Threat in violation of Section 22.07 of the Texas Penal Code. Section 22.07(a) of the Texas Penal Code makes it a criminal act when "a person commits an offense if he threatens to commit any offense involving violence to any person or property with intent. . ." The term "threaten," requires expressive conduct and thus regulates pure speech. In many ways, this case is strikingly similar to *Cohen v. California*, 403 U.S. 15 (1971) in that this statute regulates pure speech and the communication of that speech.

> The conviction quite clearly rests upon the asserted offensiveness of the words Cohen used to convey a message to the public. The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely on 'speech,' not upon any separately identifiable conduct which allegedly was intended.

*Id* at 18 (citations omitted).

To pass constitutional muster, the statute must only criminalize 'true threats.' A 'true threat' is a statement intended to cause a party to be in fear of imminent serious harm for the purpose of bringing about the fear itself. *See Virginia v. Black*, 538 U.S. 343, 358-59 (2003); *see also, Watts v. United States*, 394 U.S. 705, 708 (1969). However, the general nature of the term 'threatens' as described in the statute fails to make clear this proper application, leaving too much room for interpretation by Texas law enforcement and prosecuting attorneys. The term 'threaten,' in our common usage, is distinct and broader than the exception carved out by the United States Supreme Court.[1]

The Texas Legislature ostensibly understood the vagueness and overbreadth of § 22.07(a) of the Texas Penal Code by adding other subsections requiring a specific intent to attach to the communicated threat. As argued in the Carter's Pretrial writ, Section 22.07(a)(4) of the Texas Penal Code lists a number of types of public utilities that it is an offense to impair or interrupt by using threats to persons or property. The provision finishes with a catch-all stating, "other public service." This catch-all phrase renders this provision unconstitutionally vague and overbroad on its

---

[1] Threaten means: verb (used with object) 1. to utter a threat against; menace: He threatened the boy with a beating. 2. to be a menace or source of danger to: Sickness threatened her peace of mind. 3. to offer (a punishment, injury, etc.) by way of a threat : They threatened swift retaliation. 4. to give an ominous indication of: The clouds threaten rain.verb (used without object)5.to utter or use threats. 6. to indicate impending evil or mischief. *Dictionary.com*, "threaten," in Dictionary.com Unabridged. Source location: Random House, Inc. http://dictionary.reference.com/browse/threaten. Available: http://dictionary.reference.com. Accessed: January 26, 2015.

face as it does not clearly define what a public service is. *See Long v. Texas*, 931 S.W.2d 285 (Tex. Crim. App. 1996) (vagueness); *see also United States v. O'Brien*, 391 U.S. 367 (1968) (overbreadth).

Section 22.07(a)(5) states that it is an offense to use a threat to persons or property to "place the public or a substantial group of the public in fear of serious bodily injury." The definition of "public" as utilized in the statute is unclear as to its meaning and there is no way for a reasonable person to understand which "public" the statute is referring to in terms of jurisdiction more or less how much of this "public" is substantial. This lack of clarity likewise renders this provision unconstitutionally vague and overbroad on its face. *See Id.*; *see also Long*, 931 S.W.2d at 285

Subsection (a)(1) criminalizes the same conduct but adds the provision that the intent of the actor must be to "cause a reaction of any type to his threat by an official or volunteer agency organized to deal with emergencies". Subsection (a)(2) requires that the intent of the actor must be to "place any person in fear of imminent serious bodily injury". Subsection (a)(3) of the statute requires that the intent of the actor be to "prevent or interrupt the occupation or use of a building, room, place of assembly, place to which the public has access, place of employment or occupation, aircraft, automobile, or other form of conveyance, or other public place". Subsection

9

(a)(6) requires that the intent of the actor be to "influence the conduct or activities of a branch or agency of the federal government, the state, or a political subdivision of the state."

These subsections (22.07(a)(1)-(a)(3), and (a)(6)) include a more specific tailored explanation of the types of intended reactions or effects to the actor's conduct that are prohibited by the statute, than subsections (a)(4) and (a)(5). Subsection (a)(1) aptly defines the group of people protected as those who are officials or volunteers *involved in organizing to deal with emergencies*, while (a)(2) specifies that *any person* placed in imminent fear of serious bodily injury is protected. Subsection (a)(2) is itself further narrowed in its breadth by the penal code's definition of a "serious bodily injury". ("Serious bodily injury means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code §1.07(46). Similar language of this type of narrowly tailored intent is absent from subsections (a)(4) and (a)(5). Subsection (a)(4) prohibits actor's conduct if his intent is to "cause impairment or interruption of public communications, public transportation, public water, gas, or power supply or other public service." While public communications, transportation, water, gas, and power supply are sufficiently defined by law, *other public service* is overly broad and vague. Subsection (a)(5) prohibits the actor's conduct if it is intended to

"place the public or a substantial group of the public in fear of serious bodily injury."

Similarly to (a)(4), although serious bodily injury is well defined in the Texas Penal Code, *substantial group of the public* is not defined, and is overly broad and vague. The presence of the intent qualifiers in (a)(1)-(a)(3), and (a)(6), of the statute show a troubling contrast with subsections (a)(4) and (a)(5).

In *Long*, the Court established that a criminal statute is vague and overbroad if it does not meet at least all three prongs of the following test:

- First, <u>a person of ordinary intelligence must be given a reasonable opportunity to know what is prohibited.</u>
- Second, <u>the law must establish determinate guidelines for law enforcement.</u>
- Finally, <u>where First Amendment freedoms are implicated, the law must be sufficiently definite to avoid chilling protected expression</u>. "When a statute is capable of reaching First Amendment freedoms, the doctrine of vagueness 'demands a greater degree of specificity than in other contexts." Greater specificity is required to preserve adequately the right of free expression because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Moreover, when a vagueness challenge involves First Amendment considerations, a criminal law may be held facially invalid even though it may not be unconstitutional as applied to the defendant's conduct. *Id* at 225 (emphasis added)

Hence, to survive a challenge such as there is here, the statute must meet each of those requirements. Failing to meet even a single prong of the test proves the state

11

to be unconstitutional. Sections 22.07(a)(4) and (a)(5) meet none of the three requirements in the test.

As previously argued in the hearing on the writ and in the application, subsections (a)(4) and (a)(5) fail to provide guidance sufficient to pass constitutional muster. There is no clarification as to what the term public means. Is it a regional term? Does it refer to people in public places? The list of rhetorical questions that one would ask to clarify the meaning are innumerous. [*see* CR Vol. 1 at 14; RR Vol. 2 at 79-81].

This results in the criminalization of a vast amount of constitutionally protected speech in comparison to the statute's plainly legitimate sweep and renders the statute a threat to the First Amendment to the United States Constitution. *See Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Furthermore, the showing that a law punishes a substantial amount of protected speech, "judged in relation to the statue's plainly legitimate sweep" is sufficient to invalidate all enforcement of the law, "until and unless a limiting construction or partial invalidation so narrows if as to remove the seeming threat or deterrence to constitutionality protected expression. *See Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003) (*citing Broadrick v. Oklahoma*, 413, U.S. 601, 615 (1970). This remedy arises out of concern that "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected

12

speech – especially when the overbroad statute imposes criminal sanctions. *Hicks,* 539 U.S. at 119 (*citing Shaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (emphasis added).

This statute, as it is being enforced in this case, illustrates exactly how overbroad Section 22.07(a) can be charged. Virtually any statement that includes language of violence toward a person or property can be prosecuted.

**II. The Trial Court Abused Its Discretion by not finding Texas Penal Code §§ 22.07(a)(4) and (a)(5) Unconstitutional as Applied to Justin Carter.**

The statute is also unconstitutional as applied to Mr. Carter. The Texas Court of Criminal Appeals holds a statute "may be valid as applied to one set of facts and invalid as applied to a different set of facts," *State ex rel. Lykos v. Fine* 330 S.W. 3d 904, 910 (2011). The Court stated, "a litigant must show. . . the challenged statute was unconstitutionally applied to him." *Id.*

Mr. Carter is being prosecuted for his speech, not his conduct. Even if this Court declines to rule that the Section 22.07(a) is unconstitutional on its face, this court should find that the statute is unconstitutional as applied to him. The prosecution of this case is a violation of his free speech rights. While it is true that the First Amendment protection applies in lesser force when conduct, rather than speech, is at issue, the only "conduct" alleged in the Indictment is the communication

of Mr. Carter's speech, i.e. an alleged posting on the social media website, www.facebook.com.

Moreover, the context is clear that Mr. Carter's post was sarcastic not a 'true threat.' The Oxford Dictionary defines sarcasm as, "the use of irony to mock or convey contempt." The Cambridge dictionary defines sarcasm further, "the use of remarks that clearly mean the opposite of what they say, made in order to hurt someone's feelings or criticize something in a humorous way." (2013)

Sarcasm is a communicative mode heavily embedded in human interactions. People are social animals concerned with information and the impression the information carries.[2] Sarcasm is not outside the Constitution and laws of Texas. It is free speech, subject to the broadest interpretation. Dr. John Haiman notes sarcasm is heavily rooted in normal, daily communications.[3]

Entire movies have been based on the treatment of sarcasm. For example, in the film Forrest Gump, Dr. Haiman notes the protagonist does not understand sarcasm on any level. This is the basis for much of the humor in the movie. In one scene, Forrest Gump (a Caucasian) reports for active military duty in Vietnam with Benjamin Buford Blue (aka Bubba), an African American soldier:

**Lt. Dan:** …where you boys from in the world?

---

[2] See Steven Pinker's The Stuff of Human Thought (2007), which continues, "An implicature involves two meanings: the literal content (sometimes called the sentence meaning) and the intended message (sometimes called the speaker meaning). . . Intended messages [can be] negative, but the literal content [can be] positive or neutral (page 379)

[3] Haiman, John. Talk is Cheap: Sarcasm, Alienation, and the Evolution of Language. New York: Oxford, 1998.

> **Bubba & Forrest:** Alabama, sir!
> **Lt. Dan:** You twins?
> Forrest and Bubba look at each other oddly, they don't get the joke.
> **Forrest:** No, we are not relations, sir.[4]

The sarcasm, and ultimately the 'joke' derives from both the context of the statement and the reactions of the actors. The script describes the body language necessary to indicate sarcasm. Additionally the racial background of the characters is a necessary element to establish context. The words alone do not indicate the intended sarcasm. The example illustrates sarcasm in conversation relies on context to indicate a meaning other than the plain meaning. The usage of sarcasm is identified by context.

The Texas Court of Appeals has found body language and tonal queues indicate meaning and intent: "Intent can be acts, words, and conduct of the accused." *See Walker v. State,* 327 S.W.3d 790, 794 (Tex.App.—[2nd Dist.] 2010, no pet.). Appellant " 'bowed his chest out' and stated 'Let's do it Nekhom. It's just you and me now.'" *Id.* Posts on internet forums lack any sort of physical gesture to indicate a statement's meaning.

Nevertheless, sarcasm can be construed perfectly in words alone, but this approach requires the entire statement be considered in context. In many literary works, the context is an implicit premise necessary to arrive at the intended sarcastic conclusion. The author assumes the reader has a basic understanding of the

---

[4] "Forrest Gump" screenplay by Eric Roth, based on a novel by Winston Groom.
http://www.weeklyscript.com/Forrest%20Gump.txt (2013).

environment in which the words were written. A great deal of literature requires an understanding of the social and environmental conditions that create an implicit premise by the author. The time, context and manner devices of free speech are similarly applied to identify sarcasm in literature. For example, Geoffrey Chaucer utilized sarcasm throughout his works, perhaps most famously in the uncompleted Canterbury Tales:

> A FRIAR there was, a wanton and a merry,
> A limitour, a full solemne man.
> In all the orders four is none that can knows
> So much of dalliance and fair language.
> He had y-made full many a marriage
> Of younge women, at his owen cost.[5]

Here, a plain reading describes a friar with positive qualities. The reading indicates he is happy, solemn, and well-spoken. The last two lines seem to indicate that he has selflessly married many women at his own cost. However, the reading requires an understanding of the historical context of fourteenth century England. An understanding of the context reveals this section is pure sarcasm:

> By the 14th century, friars, who were supposed to give up all worldly things… were almost totally corrupt. They were known for flattering the rich and deceiving the poor, and especially for seducing women in outright disregard for their own celibacy. Chaucer's friar… is 'full solemne' (very

---

[5] Geoffrey Chaucer, Canterbury Tales: A Friar's Tale. http://canterburytalesfirst.wikispaces.com/The+Friar (2013).

impressive) because he knows so much about [dalliance] (flirtation). He's married women 'at his owen cost'- implying he seduced them first. [6] [7]

Another facet of sarcasm is its utility as an argumentative device. Mr. Carter replied in *reductio ad absurdum*. Mr. Carter unknowingly utilized a technique applied in mathematics and philosophy from ancient Greece to present day. *Reductio ad absurdum,* as defined by Merriam-Webster is the "disproof of a proposition by showing an absurdity to which it leads when carried to its logical conclusion." Or, stated more simply, it is a "reduction to the impossible".

The sarcastic comment presumably made to Mr. Carter, "You're fucked in the head" implies that Mr. Carter is mentally defective. This statement itself is considered in context of normative (although crude) discourse. Neither the sender, recipient, nor any reader would assume Mr. Carter had recently been sodomized, despite the fact that would be the literal meaning. The statement is considered in context. Mr. Carter understood the sarcasm and responded by reducing the statement to an absurd conclusion, "I'm fucked in the head alright. I think I'ma SHOOT UP A KINDERGARTEN." His statement/argument presupposes that only a very crazy person would hurt small children, especially a classroom of children. As noted by

---

[6] Holly Hughes & Thomas F. Hirsch, Baron's Book Notes: Geoffrey Chaucer's Canterbury Tales, page 15 (1st ed. 1984.)

[7] For further reading, see Rosalyn Rossignol, Critical Companion to Chaucer: A Literary Reference to His Life and Work. (2007). Specifically, page 109 states, "The Friar's Tale is a gem of irony and satire; its hard glittering surface giving no quarter to the man or to the profession it lambasts."

Dr. Kimball in the hearing on the case at bar, when viewed in the entire context, and framed in logic, the statement shows Mr. Carter was being sarcastic, hyperbolic and conditional. [RR. Vol.2 65-72]. He illustrated a biting response to deny an online insult through logic. The context of his statement and approach precludes any intention to elicit fear in a person or group, let alone a specific one. Mr. Carter's illustration was distasteful and tactless. Nevertheless, his chosen avenue is still afforded protection by the Constitution.

The Supreme Court of the United States has held that the First Amendment is strongest when it seeks to cause discomfort, or even anger:

> A function of free speech… is to invite dispute. It may indeed… serve its high[est] purpose when it induces…unrest, …dissatisfaction, …. or stirs people to anger… That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown to likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

*Terminiello v. City of Chicago* 337 U.S. 1, 4 (1949).

Mr. Carter has a free speech right to challenge ideas and assertions. Mr. Carter can create unrest and even stir people to anger, free from censorship. Mr. Carter asserts he did not issue a true threat. His statement was at most careless talk.

Mr. Carter's statements were not true threats, as defined by the Supreme Court of the United States. *See Black,* 538 U.S. at 358-59. Mr. Carter wrote a sarcastic

statement; a hyperbolic response to the insult he ostensibly received. The statement attributed to Mr. Carter begins, "I'm fucked in the head alright, . . ." showing a response to a previous insult. Merriam-Webster defines hyperbole as "exaggerated threats not to be taken literally." This is a constitutionally-protected statement. The statement attributed to Justin Carter in the screenshot provided to law enforcement is an example of such hyperbole. [RR Vol. 5 Defendant's Exhibit 9]. The words on their face indicate that shooting up a kindergarten is exactly what a crazy person would want to do. The point was obviously meant to deny any accusation of being crazy by drawing that conclusion to an absurdity. The statement was in poor taste and in bad timing. This was at a time when the Sandy Hook tragedy was still in the minds of many. However, being in poor taste should not allow law enforcement to overreact and ignore common sense when applying a criminal statute to the evidence they receive. This case is the result of such an abuse of discretion. The only way the State can proceed on this case is to obfuscate the plain meaning of the statement. There is no rational interpretation of the statement that would fit it under the legitimate sweep of the Terroristic Threat statute. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). In *People v. Prisinzano,* the Court found "that in order for words to be a true threat they must convey a serious or genuine threat, and must be distinguished from idle, careless talk, exaggeration… or jests." 170 Misc.2d 525, 648 N.Y.S.2d 267 (1996). If Mr. Carter's sarcastic statements are construed as careless

exaggeration, or even vile talk, it is still within his Constitutional rights. The First Amendment extends protection to vicious statements meant to incite anger and unrest. *See Terminiello,* 337 U.S. 1 at 4. Mr. Carter's case is analogous to *Terminiello* in that a statement by a speaker to a private audience was over-heard by protesters outside the auditorium, inducing riotous behavior culminating in charging the orator with breaching the peace. *Id.* But the statement attributed to Justin Carter in this case does not seek to incite a breach of the peace. It was made in the context of an online forum in the midst of conversing with one other individual. [RR Vol. 5 State's Exhibit 5].

The United States Supreme Court has further defined a statement's context, stating 'True Threats' are statements where "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *See Virginia v. Black*, 538 U.S. 343, 359 (2003). The Court further explains the standard: "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protects individuals from the fear of violence…and from the disruption that fear engenders." *Id.* This is in addition to "protecting the people 'from the possibility that the threatened violence will occur.' Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a direct speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *See Id.*

20

The United States Court of Appeals, Fifth Circuit in *U.S. v. Morales*, 272 F.3d 284 (2001) "recognizes the importance of examining statements 'in context' to determine whether they are true threats punishable by law. *See U.S. v. Morales*, 272 F.3d 284 (2001), *citing Watts v. United States,* 394 U.S. 705, 707 (1969). The Fifth Circuit continues:

> Again the focus was on whether the threat 'in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor. It is this character and context of the threat that is the relevant test.

*Id.* (citations omitted).

The United States Court of Appeals has stated a threat must "be understood by people hearing or reading it in context as a serious expression of intent." *See United States v. Bagdasarian,* 652 F.3d 1113, 1117-18 (9th Cir. 2011). The test requires the "fact-finder to look at the entire factual context of [the] statements including: the surrounding events, the listeners' reaction, and whether the words are conditional." *Id.* The court states, "whether. . . statements, considered in their full context, would be interpreted by those to whom the maker communicates the statement as a serious expression. . . " *See Id. citing Roy v. United States,* 416 F.2d 874, 876 (9th Cir. 1969).

The surrounding events indicate Mr. Carter made a sarcastic remark in response to a statement accusing him of being mentally defective. A reasonable

person would not interpret Mr. Carter's statements to be a serious expression as stated. Mr. Carter's statement presupposes two things: that Mr. Carter was mentally defective, and that the defect would cause him to commit violence. The second presupposition is contingent on the first. The contingency creates a condition that must be met. These conditional words would not be taken seriously by a reasonable person. The Ninth Circuit emphasizes the judiciary "must not distort or embellish plain meaning so that the law may reach them." *Bagdasarian,* 652 F.3d at 1117-18.

*Bagdasarian* is analogous to Mr. Carter's circumstances. Appellee, Bagdasarian posted comments on a financial message board, "a non-violent discussion forum that would tend to blunt any perceptions that statements made there were serious expressions of intended violence." *Id at* 1121. Mr. Carter's statements on the internet message board would also blunt any serious expression of intended violence. Appellee, Bagdasarian, made the statement, "Obama 'will have a 50 cal in the head soon.'" Appellant argued Bagdasarian actually owned a .50 caliber rifle, however the Court held this was not indicative. No one "who read the message board postings. . . knew. . . Bagdasarian owned a .50 caliber rifle." See *Id* at 1122. The Court held that, from the position of the message board, no one could reasonably interpret this as a threat. *Id.* This strengthens Mr. Carter's case.

The objective test also considers the listener's reactions. *See Id* at 1118. The Ninth Circuit found it, "significant that among the numerous persons who read

22

Bagdasarian's messages, the record reveals only one who was sufficiently disturbed to actually notify the authorities." *Id* at 1122. This is analogous to Mr. Carter's case. Only one person notified authorities and that person (albeit one who has not been identified and apparently does not even reside in the United States). [RR. Vol. 5 State's Exhibit 5].

The Ninth Circuit reflected on whether a subjective or objective approach is appropriate:

> Such a choice reflects a false dichotomy. The issue is actually whether. . . only a subjective analysis be applied or whether both a subjective and an objective analysis is required. . . our analysis in its most important respect is the same. . . we must find sufficient evidence that the speech at issue constitutes a 'true threat' as defined in [*Virginia v.*] *Black.*

*Id.*

The Ninth Circuit stated, "the subjective test in *Black* must be read into all threat statutes that criminalize free speech." *Id* at 1117. The Court continues, ". . . some threat statutes. . . require that the purported threat meet an objective standard *in addition*, and some do not. *Id.* Mr. Carter's free speech expression is within the Constitutional bounds for both tests.

Among the many grounds for reversing the indictment, of particular significance is the intent requirement the prosecution failed to develop. When Mr. Carter's are read objectively or subjectively, the general intent to place either a

23

public service, a group, or the public in fear of imminent harm is lacking. The relevant portions of the Texas Penal Code § 22.07(2013) Terroristic Threat states:

> (a) A person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to:
> (4) cause impairment or interruption of public communications, public transportation, public water, gas, or power supply or other public service; or
> (5) place the public or a substantial group of the public in fear of serious bodily injury.

To prosecute the statute, the accused must desire to bring actual fear or elicit a reaction of fear to a person or the public. The actual apprehension of being afraid is irrelevant, only the offender's desire to create fear of injury. *See Virgina v. Black. Id.*

At no time did Mr. Carter specify as a target a person, a group, or the public of any particular community. Mr. Carter was participating in an internet forum; there were no proximate kindergartens or schools that could be inferred from his statements in his chosen forum. He cannot have intent to carry out a terroristic threat as described in Tex. Penal Code. § 22.07(a)(4) or (a)(5) as there was no communication to anyone even remotely affiliated with any school much less a kindergarten in his region. [RR. Vol. 5 Defendant's Exhibit 6, 9; State's Exhibit 5].

A target that cannot be identified is not a target. The identification of a target is a determinative factor in assessing the intention to bring about the intended fear

or apprehension of fear. This distinction has been upheld in causes with similar facts. *See Hess v. Indiana,* 414 U.S. 105, 108-09 (1973).

In *Morales supra* at 285-287, Eduardo Morales, a high school student in Texas entered an internet chat room and stated, "I will kill…teachers and students at Milby [High School, Houston, Texas]." This statement was viewed and reported by a Washington State complaining witness. It was clear Mr. Morales indicated both a target and intentionally made the utterance to elicit a reaction. Mr. Morales has continually admitted his intention to elicit fear when he posted the statement. *Id.*

The Fifth Circuit affirmed Mr. Morales' conviction under 18 U.S.C.A. § 875 Interstate Communications: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another..." The Honorable E. Grady Jolly of the Fifth Circuit stated the government was not required to prove Morales subjectively intended to communicate a threat. First, "the government must prove that the defendant has communicated the threat to the target or someone he intended would communicate the threat to the target," and second, "that the government must prove that the defendant intended to make a threat." *Id.*

Under the standard articulated in the Fifth Circuit, Mr. Carter would have to specify a target. He would have to communicate his threat either to the target directly, or to a third party that could reasonably communicate the threat to the target.

25

Mr. Carter neither specified a target to an intended party nor a third party that would foreseeably relay that threat to the target.

In additional authority, The Seventh District Court of Appeals has stated the "requisite intent to make terroristic threats can be inferred from the acts, words, and conduct of defendant." *Cook v. State*, 940 S.W. 2d 344, 347-348 (Tex.App.—[7th Dist.] 1997, pet. ref'd). Mr. Carter's acts, words, and conduct do not indicate a specific threat to the public, a particular institution, or an individual. Mr. Carter's statements were an exaggeration, spoken to an individual in response to an insult.

Moreover, it cannot be ignored that the alleged threatening statement is initially qualified by the words, "I think Ima. . ." which indicates that the speaker is only contemplating such an act even if the statement is to be taken seriously. There is no law in country that criminalizes thinking of a crime and no reasonable person could consider a thought a true threat. To pursue this case and allow its continued prosecution would result in a prosecution for a thought crime.

Mr. Carter had the purposeful intent to be inflammatory; to utilize his First Amendment rights in a heated conversation. The Supreme Court considers the internet a public forum without explicit establishment. The Court has held the internet to a higher free speech standard in *ACLU v. Reno,* refusing to analogize the internet to broadcast or cable communications. *See ACLU v. Reno,* 929 F.Supp. 824, 858-859 (E.D. Pa. 1996). Broadcast and cable communications receive lower levels

of free speech protection than traditional public forums. *See The Next Challenge for the First Amendment: The Framework for an Internet Incitement Standard*, 51 Cath. U.L. Rev. 45 (2002) at page 453.

Mr. Carter utilized his free speech right to inflict a sarcastic remark. He did not purposefully or knowingly intend to create a threat of imminent bodily harm to any person or property. Nor did Mr. Carter intend to elicit a reaction from a supposed threat of violence. These determinations can be made from the plain meaning of the statement itself.

Alternatively, if Mr. Carter's statements are construed out of context as a threat, the statement does not meet the elements to constitute a threat outside Constitutional protection. *See Brandenburg v. Ohio,* 395 U.S. 444 (1969). *Brandenburg* outlines the modern test, as evolved from the standard set forth by Justice Holmes in *Schenck v. United States,* 249 U.S.48, 52 (1919). Justice Holmes first articulated a 'clear and present danger test' by stating the question is one of proximity and degree.

Holmes theory on assessing a 'clear and present danger' by examining the imminence of the danger to the person, was famously extrapolated as the 'marketplace of ideas' in *Abrams v. United States,* 250 U.S. 616, 630 (1919). Together, *Schenck* and *Abrams* form the background which *Watts* and *Brandenburg* support the modern standard. *See* Threats, Free Speech, and the Jurisprudence of the

Federal Criminal Law at 902. BYU Law Review (2002). These foundational cases

hold:

> The theory of ideas competing in a marketplace, that good and evil ideas must compete equally amongst men, is a necessary element of free speech. This process, the robust debate of free speech, if uninhibited by government…will lead to discovery of truth.

*Id.* at 906. The Supreme Court has articulated the limits of free speech to the

incitement of violence:

> [C]onstitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

*See Brandenburg v. Ohio,* 395 U.S. at 447 (1969) (citing *Dennis v. United*

*States,* 341 U.S. 494 (1950)).

The first two elements of Brandenburg are clearly not met. Mr. Carter did not

advocate the use of force or violation of law, nor did he intend to incite or produce

a violation of law. Mr. Carter sought to respond in a way that had little positive value,

but it is still not an incitement to violence. The Supreme Court has held that if:

> . . . the statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action. And since there was no evidence

> or rational inference from the import of language, that his words were intended to produce, and likely to produce, imminent disorder, those words could not be punished by the state.

*See Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

Mr. Carter's free speech statement is clearly within the competing marketplace of ideas, where both good and evil statements compete in the minds of the American people. Society has an interest to prevent violence and to promote order, but not in derogation of the Constitution. *See Virginia v. Black,* 538 U.S. 343, 359 (2003).

Finally, the third and fourth elements are also not met. There was no likelihood nor imminence that the lawless response would occur. *See Brandenburg* at 448. Mr. Carter was participating in an online forum that is distinct in proximity and degree from his physical location. Investigators improperly drew an inference from Mr. Carter's address in the Texas Department of Public Safety Records and its physical proximity to a school. [RR. Vol 5 State's Exhibit 5]. There is no connection between Mr. Carter's online persona and his physical-world location and identity. They are distinct and separate, and as such there was no imminence nor any likelihood of violence.

**CONCLUSION**

With the current digital age, vague and overly-broad statutes such as these create the inevitable risk that wide swaths of otherwise protected speech will be prosecuted in the current formulation of the statute. It is impossible to list just how many statements on today's social network websites, blog posts, and comment sections of news articles could be construed to violate this statute. Much of today's discourse is recorded on these internet forums. The fluid nature of day to day conversation is now on kept in records on someone's comments section of their Facebook page or in internet chat forums. The problem with this is that the common understanding and meaning of sarcastic, joking, or absurd sentences containing references to violence to property or people are easily extracted from the context that would exist for face to face interactions. This problem is not new, the Supreme Court has also addressed the nuances of language; how we say things is not always the intended message:

> . . . [M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. . . Indeed, as Mr. Justice Frankfurter has said, '(o)ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation.

*See Cohen,* 403 U.S. at 26 (*citing Baumgartner v. United States*, 322 U.S. 665, 673-674 (1944)).

This right to speak "foolishly and without moderation" is the type of protected speech that is threatened by the continued enforcement of sections 22.07(a)(4) and (a)(5) of the Texas Penal Code. Law enforcement are shouldered with the task of interpreting when a particular set of words meets the constitutional threshold and when they do not. It simply provides too much room for interpretation that is inevitably influenced by the opinions and biases of law enforcement agents and current popular hysteria. This statute, as formulated, cannot pass constitutional muster. It 'threatens' to criminalize a wide variety of speech that are not 'true threats' and thus violates the protections of Free Speech and Due Process of law. *See Virginia v. Black*, 538 U.S. 343 (2003). The continued prosecution of Justin Carter for an obviously sarcastic comment is abhorrent to the U.S. and Texas Constitutions and should not be permitted to proceed to trial. This prosecution should cease immediately.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Appellant, Justin Carter respectfully prays that this Court declare sections 22.07(a)(4) and (a)(5) facially unconstitutional and dismiss cause number CR2013-159 pending in 207th Judicial District Court of Comal County, Texas or, alternatively, declare that, as applied, the continued prosecution of Justin Carter violates his constitutional rights under the United States and Texas Constitutions and dismiss cause number CR2013-159 pending in 207th Judicial District Court of Comal County, Texas.

> Respectfully Submitted,
> THE LAW OFFICE OF CHAD VAN BRUNT
> 310 S. St. Mary's Street
> Suite 1840 – Tower Life Bldg.
> San Antonio, Texas 78205
> vanbruntlaw@live.com
> Tel: 210-399-8669
> Fax: 210-568-4927
>
>
> By: /s/Chad Van Brunt
> Chad Van Brunt
> State Bar No. 24070784
> Attorney for Richard Lopez

## CERTIFICATE OF SERVICE

This is to certify that on January 26, 2015, a true and correct copy of the above and foregoing document was served on Chari Kelly, Assistant District Attorney, Comal County District Attorney's Office 150 N. Seguin, Suite 307 New Braunfels, Texas 78130 via fax to (830) 608-2008

/s/Chad Van Brunt
Chad Van Brunt

## CERTIFICATE OF COMPLIANCE

This certifies that this document contains 7580 words.

/s/Chad Van Brunt
Chad Van Brunt